# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA, *ex. rel*
SCOTT KRELLER, and SCOTT KRELLER,
individually

               Plaintiffs,

    v.

LEONIE INDUSTRIES, LLC,
d/b/a LEONIE, d/b/a THE LEONIE GROUP,
CAMILLE CHIDIAC and REMA CHIDIAC
DUPONT

              Defendants.

Case No: 1:17-cv-01342 (ACR)

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT CAMILLE CHIDIAC'S PARTIAL MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

---

**KLAPROTH LAW PLLC**

Jesse C. Klaproth (D.C. Bar No. PA0063)
jklaproth@klaprothlaw.com
Brendan J. Klaproth (D.C. Bar No. 999360)
bklaproth@klaprothlaw.com
2141 Wisconsin Ave NW
Suite M3
Washington, DC 20007
T: 202-618-2344
F: 202-618-4636

TABLE OF CONTENTS

I.    Introduction ................................................................................................................ 1

II.   Factual Allegations ..................................................................................................... 2

   A.   The Dissemination CLIN 2010-2014 ................................................................. 2

   B.   Leonie Fraudulently Certified that it Performed Dissemination Verification ................... 3

   C.   Leonie Knew That It Was Fraudulently Billing DOD ....................................... 5

   D.   Plaintiff Learns that Leonie Was Submitting False Invoices ............................ 6

   E.   Leonie Cannot Verify Any Disseminations from 2010 to February 2014 ......... 6

   F.   Plaintiff Refused to Submit a False Invoice and was Fired ............................... 7

   G.   Plaintiff Learns that Leonie is Undercapitalized ............................................ 8

   H.   The Allegations Against Chidiac and DuPont ................................................ 11

III.  Standard on a Motion to Dismiss ............................................................................. 12

IV.   Argument .................................................................................................................. 13

   A.   Plaintiff Has Stated a Claim Against Chidiac .................................................. 13

   B.   Plaintiff Has Adequately Alleged That Chidiac is the Alter-Ego of Leonie ................... 14

   C.   Plaintiff Has Stated a Claim Under the FCA .................................................. 16

   D.   Plaintiff Has Stated a Claim Against Chidiac Personally for Fraudulent Transfer (Count III)   18

   E.   Plaintiff is the Original Source of the Information in the Complaint ............................... 19

   F.   Counts I and II Are Not Time-Barred Because Alter Ego is Not a New Cause of Action ......................................................................................... 20

V.    Conclusion ............................................................................................................... 22

# TABLE OF AUTHORITIES

**CASES**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................12

*Chidiac v. Leonie, et al.*,
    No. BC699004 (Sup. Ct. CA) ................................................................................10

*Conley v. Gibson*,
    355 U.S. 41 (1957)..................................................................................................12

*Diamond v. Davis*,
    680 A.2d 364 (D.C. 1996) ......................................................................................22

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................12

*Highland Springs Conf. & Training Ctr. v. City of Banning*,
    244 Cal. App. 4th 267 (2016)..................................................................................21

*Leatherman v. Tarrant County Narcotics & Coordination Unit*,
    507 U.S. 163 (1993)................................................................................................12

*Lee v. Wolfson*,
    265 F. Supp. 2d 14 (D.D.C. 2003) ..........................................................................22

*Ndondji v. Interpark, Inc.*,
    768 F. Supp. 2d 264 (D.D.C. 2011) ........................................................................12

*Partridge v. Am. Hosp. Mgmt. Co., LLC*,
    289 F. Supp. 3d 1 (D.D.C. 2017)............................................................................14

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974)................................................................................................12

*Smith v. D.C.*,
    674 F. Supp. 2d 209 (D.D.C. 2009) ........................................................................12

*TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*,
    808 F. Supp. 2d 60 (D.D.C. 2011) ....................................................................16, 21

*Virginia Elec. & Power Co. v. Peters*,
    No. 3:17-CV-259-JAG, 2018 WL 1995523 (E.D. Va Apr. 27, 2018)......................21

Relator, Scott Kreller, on behalf of the United States of America, and as a Plaintiff in his own right ("Plaintiff") respectfully submits this Memorandum of Points and Authorities in Opposition to The Motion to Dismiss (ECF No. 60) the Third Amended Complaint (ECF No. 42) filed by Defendant Camille Chidiac.[1]

## I.    INTRODUCTION

Plaintiff has alleged, *inter alia*, that Defendants committed fraud against the United States of America to the tune of hundreds of millions of dollars. The fraud can be summed up thusly. Defendant Leonie Industries, LLC ("Leonie") was contractually required to disseminate "promotional materials" (*i.e.* propaganda) in Afghanistan by purchasing television and satellite television airtime, billboard advertising space, and other promotional items. Leonie was also contractually required to verify that the promotional materials were actually disseminated. Leonie could only bill the Department of Defense ("DOD") for verified placements. Despite that contractual requirement, Leonie did nothing to verify its placements, but billed DOD as if it had. Between 2010-2014, Leonie knowingly billed DOD almost $120 million for unverified placements. In short, Leonie billed DOD for services it did not perform.

Leonie had annual revenues (at one point) of over $100 million. ¶5 Leonie had two members – Chidiac and his sister Defendant Rema Chidiac-DuPont ("DuPont"). ¶¶6-7. After being sued and defending the lawsuit by filing a motion to dismiss, Leonie revealed, through its former counsel, that it was so broke that it could not afford to pay its attorneys. ¶77. A small, two-person company worth hundreds of millions of dollars is now completely worthless. So, where did the money go?

---

[1] All references to "¶ __" are to paragraphs in the Third Amended Complaint ("TAC"). *See* ECF No. 42. Citations to Defendant Chidiac's Memorandum of Points and Authorities shall be referred to as "Chidiac. Mem." throughout this Memorandum.

Plaintiff was the President of Leonie at the time he was fired in March 2017. Plaintiff alleges that DuPont had sole banking authority at Leonie and used Leonie's operating account as her and Chidiac's "personal piggybank." ¶8. DuPont and Chidiac had their personal accounts pull directly from Leonie's operating account. *Id*. Those "distributions" totaled tens of millions of dollars. *Id*. By 2016, "Chidiac and DuPont took almost $75 million in distributions with no oversight or input from anyone at Leonie." ¶9.

Leonie and DuPont have failed to respond to the TAC and have been placed in default. Chidiac, the only non-defaulting Defendant, now seeks to extricate himself from this case. To do so, Chidiac essentially claims that his name is insufficiently mentioned in the TAC, so he should be dismissed under 12(b)(6), both personally and as the alter ego of Leonie; and he further claims that the Government already knew of Leonie's fraud, which would be news to the Government.[2] But Chidiac's motion is just another attempt by a defendant in this case to avoid responsibility for bilking taxpayers out of hundreds of millions of dollars. And, while Chidiac may find it painful to be left holding the proverbial bag for the defaulting defendants, sympathy is not a basis for a motion to dismiss.

## II.    FACTUAL ALLEGATIONS[3]

### A.    The Dissemination CLIN 2010-2014

---

[2]    Leonie tried a similar tack when it was defending this lawsuit (before it cried poverty), arguing that a government audit precluded Plaintiff from acting as an original source of the information. Leonie later withdrew that argument when the government pointed out that it was untrue. *See* July 7, 2020, Statement filed by USA (ECF No. 31); *See* October 10, 2022, Joint Status Report (ECF No. 37) at ¶15. Likewise, Chidiac's claim that the Government knew of the fraud alleged in the TAC as early as 2013 holds no water.

[3]    For a full recitation of all the facts, Plaintiff refers to and incorporates herein the allegations in the TAC.

Plaintiff was employed by Leonie as a Dissemination Manager in 2011. ¶5. After holding that position for approximately two years, he was promoted to the position of Global Operations Director of Leonie, which he held from November 2011 through May 2016. ¶5. He was the President of Leonie from May 2016 through May 2017. ¶5.

Leonie was the Pentagon's top propaganda producer in Afghanistan from 2008 through 2015. ¶13. Leonie worked under the Pentagon's Afghanistan Psychological Operations or "PSYOP Contract"[4] from 2009 through 2013. ¶14. Leonie's services under the PSYOP Contract were billed to a Dissemination Contract Line Item Number or "Dissemination CLIN". ¶15. Under the Dissemination CLIN, Leonie billed the DOD for disseminating promotional materials to the Afghan people by purchasing television and satellite television airtime, billboard advertising space, and other promotional items. ¶15.

### B.    Leonie Fraudulently Certified that it Performed Dissemination Verification

Under the PSYOP Contract, Leonie was contractually required to both disseminate promotional materials and to verify that the dissemination actually occurred. ¶16. In other words, Leonie was required to disseminate and verify. A classified Performance Work Statement ("PWS") laid out Leonie's obligations under the PSYOP Contract. ¶17. The PWS was "thus incorporated into and made a part of Leonie's PSYOP Contracts with the DOD." ¶17. The PWS required that Leonie perform "dissemination verification" to verify that television, radio, billboard promotional materials were actually aired by the stations selected by the United States Government, *i.e.* disseminated to the Afghani population. ¶18. The PWS set forth a detailed process that Leonie was

---

[4]    The Court may see references to the IOTF-A contract or the MISTF-A contract, however, those monikers both fall under the PSYOP contract. The IOTF-A contract was the name given to the PSYOP Contract awarded to Leonie in 2009, while the MISTF-A contract was the name given to the continuation of the PYSOP Contract awarded to Leonie in 2014. For the purposes of this case, there is no distinction (other than time period) between IOTF-A or MISTF-A. ¶14, n.1.

to follow to verify dissemination. ¶15. Verification was required so the United States Government would know whether the promotional materials (propaganda) for which it was paying were actually aired. ¶16.

Each invoice that Leonie submitted under the Dissemination CLIN required that Leonie certify that the invoice accorded with the agreements set forth in the PSYOP contract and the PWS. ¶12. Between 2010 and 2014, Leonie submitted monthly invoices to DOD certifying that it had performed all work under the PSYOP Contract and the PWS, which included dissemination verification. ¶17. Those monthly invoices over that time period totaled approximately **$119,368,536**. ¶22.[5] But each of those invoices were false because Leonie performed no dissemination verification between 2010 and 2014. ¶23. As a result, the United States taxpayers paid Leonie almost $120 million for services that it did not provide. ¶¶24-26.[6]

During the four-year period that Leonie was submitting monthly invoices to DOD under the Dissemination CLIN, Leonie knew that dissemination verification was required (it was laid out in the PWS), yet Leonie "had no mechanism in place or ability to verify that the work for which it billed was actually performed." ¶27. By way of example:

> if DOD requested that a television public service announcement air 1,000 times over the course of a week. Leonie billed the DOD for all 1,000 television spots, plus Leonie's purported costs, without ever verifying that the piece was aired a single time, let alone 1,000 times. As part of that bill, Leonie was also certifying that it had

---

[5]    Plaintiff reached this calculation from Leonie's own documents. Specifically, a spreadsheet known as its "Master Tracker" that tracked every placement, vendor, amount billed, etc. between 2010 and 2014. From that Master Tracker, Plaintiff calculated that Leonie billed the DOD $119,368,536 for products that were never verified as having been disseminated. ¶31.

[6]    Leonie will claim that Plaintiff cannot prove the negative that the promotional materials did not air. But Leonie forgets though that under the PWS, Leonie was required to verify the disseminations. Leonie billed the U.S. Government for these dissemination services even though it never verified that they occurred. Leonie cannot be the beneficiary of its fraud at the expense of the United States taxpayer.

performed the dissemination verification of the 1,000 television spots, and that they had actually aired.

¶28.

### C.    Leonie Knew That It Was Fraudulently Billing DOD

Leonie billed DOD for its actual costs in placing a disseminated product, but Leonie was also compensated for its own services, which entailed verifying dissemination. ¶49. Despite that, Leonie did not actually verify dissemination before 2014. ¶49.

The invoices submitted under the Dissemination CLIN from 2010 to 2014 passed through a number of levels of review prior to Leonie submitting them to the DOD for payment: (1) they were compiled and drafted in Afghanistan; (2) sent to the U.S. where they were reviewed by the VP of Operations at Leonie and the Director of Operations; (3) sent to the VP of Finance and the Finance Manager, who would finalize the format and numbers; (4) sent back to the VP of Finance, the VP of Operations and the CEO; (5) the CEO briefed the owners and Board Members of Leonie on the invoice, who would approve its submission; and (6) either the VP of Finance or the Finance Manager would submit the invoice to DOD through the government portal. ¶¶32-39. At each step of this process, every individual responsible for the creation, editing, approval and submissions of invoices had access to and knew that the PWS required the verification of each disseminated product. ¶39.

The website portal required a verified username and password to track the individual user at Leonie, who was submitting the invoice. ¶38. The portal also required that the user check a box certifying: "I certify that all payments requested are for appropriate purposes and in accordance with the agreements set forth in the contract." ¶38. Each invoice submitted by Leonie between 2010 and 2014 was falsely certified. ¶39.

### D.    Plaintiff Learns that Leonie Was Submitting False Invoices

Plaintiff had no role in the creation or submission of invoices to DOD. ¶29. As a dissemination manager in 2011, Plaintiff had no access to, nor was he aware of the contents of the PWS. ¶24 Plaintiff first became aware of the contents of the PWS and Leonie's fraud in January 2014. ¶¶40-44.

On January 15, 2014, Plaintiff was tasked with responding to DOD's request for information related to Leonie's dissemination verification process. ¶40. Leonie's VP of Operations sent Plaintiff to Afghanistan to meet with the LTC Kevin Petro and the Contracting Officer Representative. ¶42. At that meeting, Plaintiff was asked about Leonie's process for verifying the airing of TV and radio placements. ¶43. Plaintiff told them that he would investigate and report back in 48-72 hours. ¶43.

This was the first time Plaintiff was made aware that Leonie was required to verify its dissemination. ¶44. Plaintiff looked at the PWS for the first time to determine what was required. ¶44. Plaintiff discovered that the PWS sets forth very detailed procedures to verify dissemination. ¶45. Because Leonie had not followed those procedures to date, Plaintiff and other employees at Leonie put together a document called "Dissemination Verification Standard Operating Procedures ("SOP") to follow the mandates of the PWS. ¶45. Plaintiff submitted the SOP to DOD in response to its request for information regarding Leonie's verification procedures. ¶45.

Unbeknownst to DOD, the SOP had only been drafted on February 8, 2014, and none of the procedures in the SOP or the PWS had ever been implemented or followed by Leonie prior to that date. ¶46.

### E.    Leonie Cannot Verify Any Disseminations from 2010 to February 2014

Once Plaintiff realized that Leonie had been both breaching its contract and falsely certifying invoices to DOD, he tried to verify Leonie's dissemination post hoc, but could not. *See*

¶¶47-49. Plaintiff contacted Leonie's VP of Operations and Program Manager and advised them that Leonie could not verify that any of the disseminations it billed DOD for from 2010-2014 were ever disseminated. ¶50. Plaintiff suggested that Leonie contact DOD to "come clean before DOD became aware" but Plaintiff was told "don't peel that onion." ¶50.

After Plaintiff became aware of the dissemination requirements under the PWS, Leonie began verifying its disseminations, by tracking whether television and radio placements were aired. ¶51. The tracking revealed that more than half of its radio placements were not being aired and less than 75 percent of television placements were being aired. ¶53. Television and radio made up almost 95 percent of Leonie's invoices under the Dissemination CLIN. ¶53. And Leonie was using the same vendors as before, which means that had it been verifying dissemination, it is more likely than not that, prior to 2014, a huge number of radio and television placements were never aired. ¶53.

After it began verifying and determining that many of the placements were not being aired, Leonie began reconciling its invoices to reflect that fact. ¶55. Notably, the requirements of the PSYOP contract and the PWS, as they pertained to dissemination verification, never changed. ¶¶55-56. The only change was that Leonie was now adjusting its invoices to reflect only the work performed. ¶¶55, 57. Leonie performed no reconciliation for the more than $119 million that it billed between 2010-2014 under the Dissemination CLIN. ¶56.

### F.    Plaintiff Refused to Submit a False Invoice and was Fired

Plaintiff was promoted to President of Leonie in May 2016. ¶60. A month into his new position, Leonie began preparing the final invoice under the PSYOP Contract in the amount of $4.5 million. ¶60. At this point, Leonie was tracking and verifying the placement of disseminated products, using a spreadsheet entitled "Dissemination Tracker". ¶61. Leonie was also storing the actual recordings of placements on a server. ¶61.

One of Leonie's owners, Rema DuPont, pressured Plaintiff to submit the final invoice, as Ms. DuPont needed the money for her personal expenses. ¶62. Plaintiff reviewed the invoice and compared the placements with those on the Dissemination Tracker and discovered that the placements were marked as "not billed" on the Dissemination Tracker. ¶63. Plaintiff looked back at prior invoices submitted to DOD and compared them with the placements on the final invoice and concluded that $3.8 million of the $4.5 million invoice had already been submitted and billed to the Government. ¶63.

Plaintiff told Ms. DuPont and Leonie's CEO that he could not submit the invoice as drafted but continued to face pressure from DuPont to submit all $4.5 million of the placements. ¶64. Plaintiff told DuPont and the CEO that he would need to view/listen to the actual recordings of the placements to verify the accuracy of the invoice, but the server was not functioning. ¶65. The CEO agreed with Plaintiff, but DuPont demanded that Plaintiff submit the invoice as drafted. ¶66. Plaintiff refused and he was terminated. ¶66.

Plaintiff does not know whether the invoice was submitted and if so, in what form because he was fired. ¶67. However, if the invoice was submitted as drafted and contained $3.8 million in duplicative billings, Leonie, through its owner and CEO, knew that the invoice sought payment for services that had already been rendered and billed to the United States Government. ¶70.

### G.     Plaintiff Learns that Leonie is Undercapitalized

Plaintiff filed his lawsuit under seal on July 7, 2017. The case was unsealed on March 4, 2020. See ECF No. 20. Following service of the unsealed pleadings, Defendant moved to dismiss Plaintiff's First Amended Complaint. ECF No. 26.

In response to Defendant's motion, Plaintiff filed his opposition (ECF No. 28), but also moved to amend the complaint (ECF No. 29). By minute order, dated June 10, 2020, the Court

granted Plaintiff's motion to amend the complaint and denied Defendant's motion to dismiss as moot.

Defendant filed a motion to dismiss the Second Amended Complaint on June 24, 2020. ECF No. 30. On July 7, 2020, the United States filed a response to Defendant's motion to dismiss. ECF No. 31. Defendant filed its reply in further support of its motion to dismiss the Second Amended Complaint on July 15, 2020. ECF No. 33. Thus, the briefing on Defendant's motion to dismiss was completed as of July 15, 2020.

This matter was originally assigned to Justice Ketantji Brown Jackson. ¶72. Following the completion of briefing on Defendant's motion to dismiss, Justice Jackson was elevated to the United States Court of Appeals for the District of Columbia Circuit, and, as we all know, was later elevated to the Supreme Court of the United States. ¶72.

This matter was reassigned to the Honorable Florence Y. Pan on October 1, 2021. ¶73. Upon reassignment, Judge Pan conducted a status conference on October 21, 2021. During the conference, the parties agreed to engage in preliminary settlement discussions and report back to the Court regarding the status of those discussions. *See* Minute Order, dated October 21, 2021. The parties filed a joint status report on November 19, 2021, advising the Court that the parties' discussions surrounding settlement revealed that it was necessary for the Court to decide the pending motion to dismiss before the parties were able to engage in productive discussions regarding settlement. ECF No. 36.

The parties filed a status report on October 10, 2022; at which time, Plaintiff through his counsel, learned that Leonie's counsel intended to file a notice of withdrawal. *See* ECF No. 37, ¶16. Leonie's counsel's motion to withdraw was filed on December 20, 2022. See ECF No. 39.

On February 24, 2023, this matter was reassigned to the Honorable Ana C. Reyes. On March 16, 2023, at a status conference, Plaintiff learned through his attorney, for the first time that Leonie was so undercapitalized that it was unable to pay its attorneys to defend this lawsuit. ¶77. Basically, Leonie was insolvent, which was the basis for its counsel's motion to withdraw. ¶77.

Thus, Leonie, a company run by the brother-sister team of Chidiac and DuPont, which had been awarded government contracts worth hundreds of millions of dollars in the two years before Plaintiff's lawsuit was filed now had no money to pay its lawyers. ¶78.

Because no discovery has been conducted in this case, Leonie's counsel's representation at the status conference was the first time that Plaintiff knew or could have reasonably known that Leonie, a company worth hundreds of millions of dollars at the onset of this litigation cannot afford to pay its attorneys. ¶78. With this information, Plaintiff, through his counsel, was able to unearth litigation between Chidiac and DuPont in state court in California that involved allegations of DuPont taking excessive, unjustified distributions from Leonie.[7] Chidiac claimed that he, as a 49 percent owner of Leonie, had not received the equivalent, excessive, unjustified distributions that were paid to DuPont. *See Chidiac v. Leonie, et al*., No. BC699004 (Sup. Ct. CA) (the "California Action"). That case settled confidentially in 2020. ¶81.

Plaintiff sought and was granted leave to file a Third Amended Complaint, adding Chidiac and DuPont as Defendants under an alter-ego theory, as well as adding a claim alleging that Leonie engaged in fraudulent transfer of assets to insiders, including Chidiac and DuPont.

---

[7]    Ironically, in the California Action, Chidiac was alleging that DuPont "used Leonie's funds for her personal benefit. This includes but is not limited to using Leonie's funds to pay for her vacation, airfare, personal meals, and executive transportation." ¶80. Chidiac's lawsuit essentially claimed that he was entitled to distributions equaling DuPont's. ¶80. This is not the defense that Chidiac believes it to be, as DuPont may have been stealing from Leonie at the expense of both Leonie and Chidiac, but because Chidiac received a settlement to equalize those illegal distributions that is a fraudulent transfer to an insider.

### H.     The Allegations Against Chidiac and DuPont

Chidiac owns 49 percent of Leonie with DuPont owning the remaining 51 percent. ¶¶6-7. The two owners, who are also brother and sister used Leonie as their personal piggybank. ¶8. Chidiac and DuPont had their personal bank accounts linked directly to the operating account of Leonie and pulled money directly from Leonie any time they desired. ¶8. DuPont had sole banking authority, which left Leonie powerless to stop the transfers. ¶8. The transfers to DuPont and Chidiac were so frequent and so large that Leonie was often left with insufficient funds to conduct its own business. ¶8. The transfers totaling almost $75 million through 2016 left Leonie undercapitalized. ¶8. Moreover, by siphoning funds from Leonie's operating account into their own accounts, Chidiac and DuPont intermingled their personal funds with the assets of Leonie.¶9.

Since the initiation of Plaintiff's lawsuit in 2007, it is believed that Chidiac and DuPont have completely drained Leonie of any of its funds, leaving the company with no money to defend itself against this lawsuit or to pay any judgment that may result therefrom. ¶10. As a result, Leonie's identity has become indistinguishable from that of Chidiac and DuPont, effectively making it a mere instrumentality and/or alter ego of their personal interests. ¶11. Consequently, Chidiac and DuPont should be held personally responsible for Leonie's debts.¶12.

In addition, Chidiac and DuPont neglected corporate protocols, such as complying with Leonie's Operating Agreement. ¶12. Despite the Board of Managers' authority to conduct business on behalf of Leonie, Chidiac and DuPont continued to siphon money out of Leonie without the approval or even the knowledge of the Board. ¶12. By unilaterally granting herself sole signing authority over Leonie's bank account, DuPont violated the Operating Agreement, rendering Leonie's officers and Board of Managers powerless to intervene. ¶12.

> the fact that Chidiac and DuPont had already been taking unilateral, excessive distributions in the years before this lawsuit was filed; the allegations in California Action and the fact that the case settled

> (Leonie must have covered some if not all the settlement payments); and basic common sense (where did hundreds of millions of dollars go?); it is clear that the members of Leonie – Chidiac and DuPont have stripped Leonie of its assets for the their personal gain and to avoid future judgment creditors, such as Relator here.

¶82.

## III.    STANDARD ON A MOTION TO DISMISS

"All that the Federal Rules of Civil Procedure require of a complaint is that it contain a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Smith v. D.C.*, 674 F. Supp. 2d 209, 210 (D.D.C. 2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).[8] The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), and they must thus be given every favorable inference that may be drawn from the allegations of fact. *Twombly*, 550 U.S. at 584.  For a plaintiff to survive a 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor." *Ndondji v. Interpark Inc.,* 768 F. Supp. 2d 264, 271 (D.D.C. 2011) (citing *Leatherman v. Tarrant County Narcotics & Coordination Unit*, 507 U.S. 163, 164 (1993)). Plaintiff has met this pleading standard with respect to the claims in the TAC.

---

[8]    All internal citations and quotation marks are omitted and all emphasis is added herein unless otherwise noted.

## IV.    ARGUMENT

### A.    Plaintiff Has Stated a Claim Against Chidiac

Chidiac first argues that the TAC fails to state a claim against him upon which relief can be granted. Chidiac argues that Counts I and II do not refer to him individually, and that the TAC alleges that he was not an active participant in Leonie after 2008. These arguments hold no water.

Chidiac argues that the TAC alleges that DuPont was in complete control of Leonie, but the TAC only alleges that DuPont was in complete control over Leonie's banking. ¶7. The TAC also alleges the operating account of Leonie transferred money directly into the personal accounts of Chidiac and DuPont "any time they desired." ¶8 So, while DuPont may have been the only person with the ability to stop the transfers (discovery will reveal more), she was using Leonie's operating account to enrich both her and her brother, Chidiac, at the expense of the LLC. *Id*.
In addition, Chidiac was and is remains a 49 percent owner of Leonie. Chidiac was forced to resign from the ***Board*** of Leonie, but he did not relinquish his ownership interest in Leonie. ¶79. Leonie's Operating Agreement also required Chidiac's consent to borrow money, incur debt, settle or institute legal claims, etc. *See* ¶79; Third Amendment to Leonie Operating Agreement, attached as Exhibit 1 to TAC.

Further the dispute between Chidiac and DuPont wherein Chidiac claimed he was not receiving his equal distributions resulted in a sizeable settlement payment to Chidiac in August 2020 which constitutes fraudulent transfer in itself.[9]

---

[9] Plaintiff and Chidiac have engaged in some informal discovery thus far, and Chidiac has produced the settlement agreement, but the documents produced by Chidiac were provided in exchange for a non-disclosure agreement.

**B.      Plaintiff Has Adequately Alleged That Chidiac is the Alter-Ego of Leonie**

Under District of Columbia law, the corporate veil may be pierced under certain circumstances, such as when there is evidence of unity of ownership and interest, coupled with the use of the corporate form to perpetrate fraud or injustice. *Partridge v. Am. Hosp. Mgmt. Co., LLC*, 289 F. Supp. 3d 1, 13 (D.D.C. 2017). This principle allows individuals to be held liable for the actions of a corporation when it is shown that those individuals effectively control the corporation and that the separation between them and the corporation has dissolved, such that the individuals are mere alter egos of the corporation. *Id*. And to "adhere[] to the to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." *Id*.

Courts must also consider various factors, including:

> (1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors.

*Partridge*, 289 F. Supp. 3d at 13. No single factor is determinative. *Id*. The "inquiry is flexible;" and the determination depends on the circumstances of each case, guided by "considerations of justice and equity." *Id*.

Most importantly for this Motion, "at the pleading stage a plaintiff need only to allege sufficient facts to support a plausible inference of alter ego liability and need not show all that would be required to prevail at trial. *Id*. This underscores the importance of considering the totality of the circumstances and the principles of equity in assessing alter ego liability.

With those factors in mind, the TAC adequately alleges that Chidiac and DuPont were the alter egos of Leonie. The TAC alleges:

- Chidiac owned 49 percent of Leonie with DuPont owning the remaining 51 percent. ¶¶6-7.

- The personal accounts of Chidiac and DuPont pulled directly from Leonie's operating account, which allowed Chidiac and DuPont to transfer funds from Leonie to themselves without any oversight of the Board of Managers. ¶8.

- Through 2016, Chidiac and DuPont took over $75 million in distributions from Leonie, without any oversight by the Board of Managers. ¶9.

- They transferred so much money from Leonie to themselves that Leonie was often in danger of not making payroll. ¶8.

- Chidiac and DuPont failed to follow corporate formalities, such as complying with Leonie's Operating Agreement, which provided the Board of Managers with express authority to conduct business on Leonie's behalf. In reality, the Board of Managers had no ability to stop Chidiac and DuPont from siphoning money from Leonie to their own personal accounts. ¶12.

- Leonie had revenue exceeding $100 million in the two years prior to Plaintiff's lawsuit, but by 2022, Leonie had no money to pay its lawyers to defend this lawsuit. ¶¶5,10.

- Since Plaintiff initiated this lawsuit, it is believed that Chidiac and DuPont transferred almost all of Leonie's money and assets to themselves. ¶10.

Applying the above four factors to the above allegations, Plaintiff has clearly adequately pleaded that Chidiac and DuPont (1) disregarded corporate formalities; (2) intermingled their own funds with that of Leonie; (3) left Leonie severely undercapitalized (they basically cleaned the company out); and (4) they continued to transfer assets from Leonie to themselves after Plaintiff's lawsuit has been filed, which is why Leonie has no ability to defend this lawsuit or pay any resulting judgment. This is a textbook example for piercing the corporate veil.

Chidiac argues that because he later sued DuPont, alleging that she was stealing from Leonie[10] that he cannot be held liable under an alter ego theory. *See* Chidiac Mem. at 10. But, while DuPont may have had unilateral control over the banking, she was making distributions to both her and Chidiac. It was only on March 20, 2018 (11 years after Plaintiff filed this lawsuit)

---

[10] Chidiac had no qualms with the sufficiency of his own pleading that DuPont was unilaterally taking unauthorized distributions. Of course, now that he finds himself on the other side of identical allegations, he resorts to arguing that that Plaintiff's allegations are insufficient.

that Chidiac sued DuPont for failing to account to Chidiac for her own unauthorized distributions, which allegedly occurred in February 2018. So, Chidiac wants a pass because in 2018 DuPont stopped including him in the scam to funnel money from Leonie to their personal accounts. But, just because DuPont had the log-in for Leonie's bank account does not negate the years in which both Chidiac and DuPont gave themselves unauthorized distributions, disregarded corporate formalities and left a $100 million business with nothing. Chidiac received millions of dollars in unauthorized distributions both before and after this lawsuit was filed, including any settlement payment made by Leonie to him to resolve the California action.

### C.    Plaintiff Has Stated a Claim Under the FCA

Chidiac spills much ink arguing that the TAC does not state a claim against him personally under Counts I and II (the FCA claims). *See* Chidiac Mem. at 12. But this was never alleged by Plaintiff, so the point is moot.[11] The TAC alleges only that Chidiac (along with DuPont) should be held liable for Leonie's fraud under the alter ego theory discussed above.

The alter ego theory is not a distinct or new claim against Leonie, but rather "a legal theory by which [Plaintiff] hopes to extend liability—on its underlying [fraud] claim—beyond [Leonie] as a corporate entity to [Chidiac and DuPont] as an individual[s]." *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 66 (D.D.C. 2011).[12] An "alter ego theory is not in itself a claim for substantive relief, but rather is procedural; it creates no cause of action because it is a means of imposing liability on an underlying cause of action." *Id*. Piercing the corporate veil is also considered an equitable, not legal remedy. *Id*.

---

[11] Plaintiff does, however, specifically allege that DuPont is personally liable (along with Leonie) for the retaliatory firing of Plaintiff (Count II).

[12] Internal quotation marks and citations omitted throughout.

16

Leaving aside the claim against Chidiac in his personal capacity, he also argues on Leonie's behalf that Leonie lacked the requisite scienter to commit fraud. *See* Chidiac Mem. at 12. The reasoning, according to Chidiac, is that Leonie never knew that dissemination had to be verified under its contract with the Government. Nonsense. This argument completely ignores the numerous allegations in the TAC regarding the Performance Work Statement or "PWS" that set forth the contractual obligations of Leonie under the PSYOP Contract. ¶17. That PWS was made part of the actual PSYOP Contract. ¶17. Each invoice submitted by Leonie for payment certified that Leonie had complied with its obligations under the PSYOP Contract. ¶17. ***And the PWS required that Leonie perform dissemination verification***. The PWS actual set forth in detail how verification was to be done. ¶20.

Plaintiff further alleged that "Leonie knew that it was required to perform dissemination verification under the Dissemination CLIN, as the requirement was set out clearly in the PWS." ¶23. The TAC further alleges in detail the "Invoice Submission Path" for each invoice submitted by Leonie under the Dissemination CLIN from its inception to completion, including every person at Leonie who saw or reviewed the invoice. ¶¶32-39. The Government's website portal also required that the individual submitting the invoice through the portal (there was a log-in and password), certified that "all payments requested are for appropriate purposes and in accordance with the agreements set forth in the contract." ¶38.

So, Chidiac's argument that the FCA claims against Leonie should be dismissed for lack of scienter is not a serious argument in light of the myriad of allegations detailing what Leonie knew and who knew it. Simply because Chidiac did not know what was in the PWS and Plaintiff did not know until January 2014 does not mean Leonie lacked scienter. Indeed, Leonie's contract imparted the knowledge of what was required and every time Leonie submitted an invoice and

stated that it had complied with that contract, it committed fraud against the United States Government.

### D.    Plaintiff Has Stated a Claim Against Chidiac Personally for Fraudulent Transfer (Count III)

While Plaintiff does not allege that Chidiac is liable in his personal capacity under Counts I and II, Plaintiff does allege that Chidiac is personally for the fraudulent transfer of Leonie's assets to "hinder, delay, or avoid the collection of any judgment against Leonie." ¶99.

Once again, Chidiac argues that because DuPont had sole access to Leonie's bank account that he cannot be held liable for fraudulent transfers. But DuPont was making unauthorized distributions from Leonie's bank account to both herself and to Chidiac, at least until February 2018 when Chidiac alleged that DuPont failed to give him his equal distributions. Thus, the "how" Chidiac participated in the fraudulent transfers was that he was receiving them from 2007 through 2018. Once he stopped receiving them, he sued DuPont and alleged that she was transferring funds from Leonie to herself for her own personal use. That lawsuit, which was brought in 2020, resulted not in DuPont returning the funds she took for her own personal use, but in paying Chidiac his share in a sizeable settlement payment. That payment to Chidiac was made in 2020, while this lawsuit was pending and a mere two years before Leonie would claim to have run out of money to pay its attorneys to defend against this lawsuit. That payment is a fraudulent transfer of assets.

But, even prior to the settlement payment to Chidiac, he had received tens of millions of dollars from the unauthorized distributions from Leonie's operating account directly to the personal bank accounts of Chidiac and DuPont. ¶8. Those transfers of money from Leonie to the pockets of Chidiac and DuPont left a company with revenue of over $100 million in 2005 with nothing by 2022.

### E.    Plaintiff is the Original Source of the Information in the Complaint

When Chidiac filed his Notice Requesting Pre-Motion Conference Regarding his Anticipated Motion to Dismiss (ECF No. 49) (hereinafter "Pre-Motion Notice"), he argued that Plaintiff's FCA claim was barred because the government was aware of the fraud as early as 2013. ECF No. 49 at 2. Chidiac's support for this argument was a 2013 DOD report. Plaintiff pointed out the lack of merit for such an argument. *See* ECF No. 50 at 2-3. So, here in his Motion to Dismiss, Chidiac abandoned that argument altogether. *See* Chidiac Mem. at 15-17.

Instead, Chidiac now argues that Plaintiff "pled himself out of court." *Id.* at 16. Mischaracterizing the allegations in the TAC, Chidiac claims that Plaintiff:

> Was alerted to the potential fraud by a DoD inquiry in January 2014, investigated because of the DoD inquiry, and uncovered the alleged fraud when responding to the DoD inquiry.

Chidiac Mem. at 16. Chidiac argues that the "subject of the Complaint was revealed to Relator by the DoD." *Id.* And then Chidiac concludes Plaintiff "is an 'opportunistic plaintiff' who has adopted a government's investigation's findings as his own in order to profit personally." *Id.* While this argument gets an A+ in rhetoric, it fails in logic and fact.

*First*, the DOD inquiry in January 2014 as to Leonie's verification procedures does not equate to "a government's investigation's findings" as Chidiac argues. No such allegation exists as to DoD issuing "investigation findings" so it is unclear what Chidiac could possibly be referring to. Chidiac tries to contort a DOD question about dissemination into a full-scale investigation with findings, it was not.

*Second*, in response to the DoD inquiry as to the dissemination procedures, Plaintiff "along with the dissemination manager and program manager for Leonie in Afghanistan" created a document titled, "Dissemination Verification Standard Operating Procedures" ("SOP"). The SOP "was provided to DOD in response to DOD's request for information regarding Leonie's

19

verification procedures," but "Leonie never told DOD that the SOP had only been drafted on February 8, 2014 and not of the procedures set forth in the SOP had ever been implemented or followed by Leonie up to the that point." ¶¶45-46. Thereafter, Plaintiff flew to Lebanon in order to verify that the dissemination Leonie had billed DoD did in fact occur. ¶47. At that time, Plaintiff learned that Leonie had not performed any dissemination verification as required under the PWS and could not verify if any of the television and radio spots it billed DoD had actually occurred. ¶48. From Lebanon, Plaintiff called Leonie's Vice President of Operations and its Program manager to inform them that Leonie could not verify any of the radio or television spots that it had billed DoD for and "suggested that Leonie contact DOD to come clean before DOD became aware." c50. Plaintiff was told "don't peel that onion." ¶50. In short, Leonie responded to the DoD inquiry by providing the SOP that outlined the verification procedures that were only created in response to the DoD inquiry, but then led DoD to believe that the SOP verification procedures had been in place all along. And Plaintiff's efforts to have Leonie come clean with DoD were rejected by his superiors.

How Chidiac read these allegations to conclude the government performed an investigation, and issued findings at the conclusion of this investigation that Leonie committed fraud, is sophistry. But nonetheless, no such allegations exist in the TAC. DOD did not know that Leonie was not verifying disseminations until Plaintiff filed this lawsuit in 2017. Thus, the public disclosure bar has no application here.

**F.    Counts I and II Are Not Time-Barred Because Alter Ego is Not a New Cause of Action**

Although not raised in his Pre-Motion Notice, Chidiac adds a new argument in his motion to dismiss claiming that Counts I and II are time-barred as to Chidiac. As stated above, Plaintiff is not suing Chidiac in his personal capacity under Counts I and II, but merely seeking to hold him

liable for Leonie's actions under the alter-ego theory. Also, as stated above, the alter ego theory is

not a distinct or new claim against Leonie, but rather "a legal theory", which is not a claim for

substantive relief, but rather a procedural mechanism to extend liability on an underlying claim

beyond the corporate entity to individuals, such as Chidiac and DuPont.[13] *TAC-Critical Sys., Inc.*,

808 F. Supp. 2d at 66. Accordingly, since Plaintiff did not bring claims against Chidiac personally

in Counts I or II of the TAC, there are no new claims that could be time-barred.

Moreover, even if alter ego liability had a statute of limitations (it does not), the statute of

limitations did not accrue until March 2023. Specifically, Plaintiff *discovered* "for the first time

that Leonie was so undercapitalized that it was unable to pay its attorneys to defend this lawsuit"

at a court hearing on March 16, 2023.  ¶77. Indeed, the fact that a small company run by a brother

and sister, which had received hundreds of millions of dollars of government contracts" was now

so broke that it could not even pay its lawyers, only came to light in March 2023. And this was the

first that Plaintiff could have possibly known that Chidiac and Dupont drained all of the assets out

of the company. ¶78.  Plaintiff then learned that Chidiac had sued DuPont alleging:

> During 2018, DuPont has used Leonie funds for her personal
> benefit. This includes but is not limited to using Leonie's funds to
> pay for her vacation airfare, personal meals, and executive
> transportation.

¶80.  Chidiac claimed in that lawsuit that DuPont had taken hundreds of thousands in personal

distribution without Chidiac receiving a corresponding distribution, as well as making

unauthorized distributions to DuPont's son totaling $153,421.15. *Id.*  The lawsuit settled

confidentially in 2020. ¶80.

---

[13]     Some courts have looked to the laches doctrine or the statute of limitations for judgments
with respect to alter ego theories. *Virginia Elec. & Power Co. v. Peters*, No. 3:17-CV-259-JAG,
2018 WL 1995523, at *4 (E.D. Va. Apr. 27, 2018*); Highland Springs Conf. & Training Ctr. v.
City of Banning*, 244 Cal. App. 4th 267, 287, 199 Cal. Rptr. 3d 226, 241 (2016). But the Court
needs to do neither here as Chidiac has not raised either argument.

Thus, under the discovery rule,[14] the earliest that Plaintiff could have discovered that Leonie was insolvent, and that Chidiac and DuPont were the alter egos of Leonie was March 16, 2023. *Diamond v. Davis,* 680 A.2d 364, 379-381 (D.C. 1996) (establishing the legal standard for the discovery rule). Plaintiff sought leave to amend his complaint to add Chidiac and DuPont on April 12, 2023, less than one month later. ECF No. 41. And the TAC was filed on April 14, 2023. ECF No. 42. Thus, Plaintiff's alter ego claims[15] against Chidiac are timely.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Chidiac's Motion.

Date: March 29, 2024                    Respectfully submitted,

**Klaproth Law PLLC**

*/s/* Jesse Klaproth
Jesse C. Klaproth (D.C. Bar No. PA0063)
jklaproth@klaprothlaw.com
Brendan J. Klaproth (D.C. Bar No. 999360)
bklaproth@klaprothlaw.com
2300 Wisconsin Ave NW, Suite 100A
Washington, DC 20007
T: 202-618-2344
F: 202-618-4636
*Attorneys for Relator/Plaintiff Scott Kreller*

---

[14]    Issues involving the discovery rule, which are factually intensive, are inappropriate to resolve on a motion to dismiss. *Lee v. Wolfson*, 265 F. Supp. 2d 14, 19 (D.D.C. 2003) ("Since determining when a claim accrues is a question of fact, it is for jury and not the court to decide").

[15]    Chidiac does not argue that the fraudulent transfer claim (Count III) is time barred.

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the above memorandum to be served on all counsel of record by e-filing.

Date: March 29, 2024                    /s/ Jesse Klaproth
                                        Jesse C. Klaproth